# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| HAMZA RAMZAN, Individually and On Behalf of All Others Similarly Situated, | Case No.: 4:18-cv-00539-ALM-KPJ |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| GDS HOLDINGS LIMITED, WILLIAM WEI HUANG, and DANIEL NEWMAN, | CLASS ACTION |
| Defendants. | **JURY TRIAL DEMANDED** |

Lead Plaintiff Yuanli He and named plaintiff Michael Zollo ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Defendants public filings with Chinese regulatory agencies, including the State Administration for Industry and Commerce ("SAIC") and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Defendants' conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody.  Plaintiffs believe that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired the American Depositary Shares[1] ("ADSs") of GDS Holdings Limited ("GDS" or the "Company") from March 29, 2018 through July 31, 2018, inclusive (the "Class Period").[2]

2.      Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      The federal securities laws required that GDS, as a public company traded on the NASDAQ stock market, provide accurate, truthful and complete disclosure of its business and operations, including accurate financial statements, and ensure that none of its statements to investors was misleading.

4.      GDS claims to be a leading developer and operator of data centers in the People's Republic of China ("PRC" or "China").  GDS' data centers operate primarily in China's major economic hubs: Shanghai, Beijing, Shenzhen, Guangzhou, and Chengdu.  GDS generates most of its revenue from providing colocation services, whereby GDS provides space,

---

[1]  American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.
[2]  Excluded from the Class are Defendants, present and former officer and directors of the Company, members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any such excluded person have or had a controlling interest.

power, and cooling services for customers to house and operate their IT system equipment in GDS' data centers.

5.       GDS presents itself to investors as a flourishing business, with its data centers in high demand, and its business continually expanding.  In its Form 20-F annual report for the fiscal year 2017, GDS claimed that it had agreements in place with customers to lease the entirety of GZ1, the six-story flagship data center in Guangzhou whose master lease GDS purportedly acquired in 2016.  In a subsequent earnings call, GDS repeated that it had secured customer commitments for 100% of the usable space in the GZ1 data center, and also claimed that 94% of the usable space in the GZ1 data center was already generating revenue for GDS.

6.       GDS also claims in its SEC filings that it acquired three companies in 2017 and 2018 that operate their own data centers: Shenzhen Yaode, which operated the SZ5 data center in Shenzhen; Guangzhou Weiteng Network, which operated the GZ2 data center in Guangzhou; and Guangzhou Weiteng Data, which operated the GZ3 data center in Guangzhou.

7.       According to GDS, it acquired Shenzhen Yaode for RMB 312 million, Guangzhou Weiteng Network for RMB 234 million, and Guangzhou Weiteng Data for RMB 262 million.[3]

8.       None of this, however, was actually true.  On July 31, 2018, Blue Orca Capital ("Blue Orca") published a research report exposing GDS' lies.  Blue Orca Capital is an

---

[3]  RMB, or Renminbi, is the currency used in the PRC.  During the Class Period, the average exchange rate of RMB for U.S. dollars was 0.15 RMB per one U.S. dollar.

investment and equities research firm founded by Soren Aandahl, a former federal judicial clerk, corporate lawyer, and Wall Street veteran.[4]

9.      The Blue Orca Report ("BO Report") revealed that two other data center operators - in other words, companies whose business directly competed against that of GDS - were operating data centers in the building that supposedly housed GDS' GZ1 data center. These two companies occupied 2.5 floors of the 6-story GZ1 data center.  Because the first floor was a lobby, Blue Orca concluded that GDS at most occupied the remaining 2.5 floors of the GZ1 data center.  Hence, it is impossible that GDS would have customer commitments in place for 100% of the space in the GZ1 data center.

10.     Plaintiffs' own investigator confirmed Blue Orca's findings.   Additionally, Plaintiffs' investigator found that GDS did not occupy and did not operate *any* space in the GZ1 data center at all.   The 2.5 floors that Blue Orca said GDS *might* have occupied actually belonged to the Chinese technology giant Tencent Technology (Shenzhen) Co. Ltd. ("Tencent").   Plaintiffs' investigator also found a fourth company, Guangdong Zhonghe, occupying a small, half-floor, space in GZ1.

11.     Blue Orca and Plaintiffs' investigator also confirmed that none of the tenants in GZ1 were leasing their space from GDS.   In fact, the landlord of the GZ1 building told Plaintiffs' investigator that subleasing or re-leasing to third parties is not permitted.

---

[4] Mr. Aandahl graduated from Harvard Law School, clerked for United States District Judge Algenon Marbley of the Southern District of Ohio, and then practiced corporate law at the law firm of Kirkland & Ellis LLP.  He subsequently joined Glaucus Research Group as Director of Research before founding Blue Orca Capital.

12.     Therefore, GDS' claim that it operated the GZ1 data center, and that it had customer commitments for the entire space, and that 94% of the space was already generating revenue for GDS, was completely false.

13.     The Blue Orca Report also revealed that GDS lied about the purchase price of the three data center companies that it acquired in 2017 and 2018.  Blue Orca obtained regulatory filings that the three acquired companies filed with the Chinese State Administration for Industry and Commerce ("SAIC"), which showed that the actual purchase prices were a fraction of what GDS claimed in its SEC filings.

14.     For example, SAIC filings show that GDS acquired Shenzhen Yaode for a mere RMB 0.5 million, not RMB 312 million as GDS claimed in its SEC filings.  Similarly, SAIC filings show that GDS acquired Guangzhou Weiteng Network for RMB 72 million (not RMB 234 million per GDS' SEC filings), and that GDS acquired Guangzhou Weiteng Data for RMB 40 million (not RMB 262 million as GDS claimed in its SEC filings).

15.     Blue Orca stated that GDS inflated the purchase prices so that GDS' insiders could siphon off the difference for themselves.  The way GDS' keeps its cash – 65% of its cash is kept offshore and 76% of GDS' cash balance is not in RMB – suggests insiders were more interested in looting cash than in using it to fund GDS' business operations.  Indeed, it is inexplicable that GDS, whose business operates exclusively in China, would keep 65% of its cash offshore while at the same time borrowing money in China at interest rates approaching 10%.  Money kept offshore is easily looted by insiders but useless for constructing or operating data centers in China.

16.     Immediately following the issuance of the Blue Orca Report and the adverse disclosures contained therein, the price of GDS ADSs fell $12.92 per share, or over 37%, to close at $21.83 per share on July 31, 2018, damaging Plaintiffs and other GDS investors.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21.     Lead Plaintiff Yuanli He ("He"), as set forth in He's previously-filed PSLRA Certification (Dkt. No. 8-3), incorporated by reference herein, purchased GDS shares during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

22.     Named plaintiff Michael Zollo ("Zollo") purchased GDS ADSs during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

Zollo's PSLRA Certification is attached hereto as Exhibit 1 and incorporated herein by reference.

23.    Defendant GDS is a Cayman Islands corporation headquartered in China.  GDS purports to develop and operate data centers in China.  GDS primarily generates revenue from providing colocation services, in which GDS provides space, power and cooling to customers for housing and operating their IT system equipment in GDS' data centers. According to GDS, its customers include financial institutions, telecommunication and IT service providers, and other domestic private sector and multinational corporations. GDS' ADSs trade on NASDAQ under the ticker symbol "GDS."

24.    Defendant William Wei Huang ("Huang") is the Company's founder, Chairman of the Board of Directors, and Chief Executive Officer ("CEO").  According to GDS' SEC filings, including its 20-F annual report for the 2017 fiscal year, filed with the SEC on March 29, 2018 (the "2017 20-F"), Huang has substantial control over all of GDS' corporate actions through his position as CEO and Chairman, and through his 100% ownership of GDS' Class B shares. Class B shares are entitled to 20 votes per share.  According to the 2017 20-F, Huang's shares represent 59.4% of aggregate voting power.

25.    Defendant Daniel Newman ("Newman") is GDS' Chief Financial Officer ("CFO"), a position that he has held since September 2011.  Before joining GDS, Newman was a managing director at Bank of America, responsible for investment banking clients in the TMT (telecom, media, and technology) sector in Asia.

26.    Defendants Huang and Newman are collectively referred to herein as the "Individual Defendants."

27.    Each of the Individual Defendants:

     (a)     directly participated in the management of the Company;

     (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

     (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

     (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

     (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

     (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

     (g)     approved or ratified these statements in violation of the federal securities laws.

28.     GDS is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to GDS under *respondeat superior* and agency principles.

30.     Defendants GDS and the Individual Defendants are collectively referred to herein as "Defendants."

## ALLEGATIONS OF FRAUD

### GDS: Company Background

31.     GDS is purportedly a leading developer and operator of data centers in China. GDS' data centers operate primarily in China's major economic hubs: Shanghai, Beijing, Shenzhen, Guangzhou, and Chengdu.   GDS generates most of its revenue from providing colocation services, whereby GDS provides space, power, and cooling services for customers to house and operate their IT system equipment in GDS' data centers.   In 2015, 2016, and 2017, colocation services accounted for 71.2%, 72.9%, and 75.4% of GDS' total revenue, respectively. GDS also generates revenue from providing managed services and consulting services to its customers in China.

32.     GDS conducts its operations in China through a complex network of wholly-owned Chinese subsidiaries and variable interest entities ("VIEs").   GDS controls its VIEs through a series of contractual arrangements, but GDS does not hold ownership interest in any of its VIEs.[5]   GDS consolidates the financial information of its subsidiaries and VIEs in its consolidated financial statements in accordance with GAAP.

33.     On November 2, 2016, GDS' shares began trading on NASDAQ under the ticker "GDS."   In conjunction with the listing, GDS held an initial public offering ("IPO") in which it issued and sold a total of 19,250,000 ADSs at an initial offering price of $10.00 per ADS, raking

---

[5]   China has enacted laws to prohibit foreign investors from owning businesses in certain industries.   To get around that law, companies use the VIE contract structure to give foreign investors *de facto* control over business entities technically owned by Chinese citizens.   It is unsettled as to whether a Chinese court would enforce the VIE contractual arrangement.   Thus, foreign investors are at the mercy of the Chinese nationals who legally own and control the Chinese operating entities.

in $192,250,000 from U.S. investors.

**Fraud 1: GDS and its Flagship Guangzhou Data Center**

**Background: GDS Acquires Guangzhou Weiteng and the GZ1 Data Center**

34.     On May 19, 2016, GDS acquired Guangzhou Weiteng Construction Co. Ltd. ("Guangzhou Weiteng Construction"), a PRC company that purported to operate a data center in Guangzhou.  GDS calls this data center "GZ1."  According to GDS' Registration Statement[6] filed with the SEC on October 4, 2016, as of the date of the acquisition, the GZ1 data center had just begun its operations.

35.     GZ1 is a six-story data center located in the G6 building, at 31 Kefeng Road, Guangzhou, China.  The G6 building is one of the buildings in the Guangzhou Innovations Park, owned by Guangzhou South China Advanced Materials Innovations Park Co. Ltd. ("South China Innovations Park").

36.     GDS' Registration Statement includes a redacted copy of a purported lease agreement between Guangzhou Weiteng Construction and South China innovations Park purporting to show that Guangzhou Weiteng Construction had a 14-year lease for the entire G6 building, with the lease term running from April 1, 2015 to July 14, 2029.

37.     The acquisition of Guangzhou Weiteng Construction - and the GZ1 data center – ostensibly allowed GDS to establish a footprint in the lucrative Guangzhou market, the third largest city in China behind Shanghai and Beijing.  Prior to the acquisition of GZ1, GDS had no data centers in Guangzhou and thus could not provide colocation services in the important and lucrative Guangzhou market.

_____

[6]   The Registration Statement is an investment prospectus, along with exhibits, that is given to investors in the initial public offering to provide full disclosure under the federal securities laws.

**GDS Lies about its Commercialization of GZ1**

38.     In GDS' 2017 20-F, GDS claimed that, as of December 31, 2017, it had equipped and outfitted 6,521 square meters of space in GZ1 (representing the total "Area in Service"). GDS also claimed that 100% of GZ1's Area in Service was "committed" to customers, and 90% of the Area in Service was "utilized."

39.     GDS defines "areas committed" as the "net floor area of data centers in service for which agreements from customers remain in effect."  In other words, any floor area that is "committed" means that there is a contract/agreement/lease with a customer for the use of that floor area.

40.     GDS defines "area utilized" as the "net floor area of data centers in service that is also revenue generating pursuant to customer agreements in effect."  In other words, any floor area that is "utilized" means that GDS has a contract/agreement/lease with a customer for that area, and GDS is already earning revenue from it.

41.     Hence, according to GDS' 2017 20-F, GDS had agreements in place with customers for 100% of the total usable space in GZ1, and 90% of that space was already generating revenue for GDS.   These were critical metrics for investors in deciding whether to invest and purchase GDS stock.

42.     Defendant Huang signed the 2017 20-F.  Defendants Huang and Newman also signed certifications pursuant to the Sarbanes-Oxley Act of 2003 ("SOX"), certifying that the 2017 20-F does not contain any false statements.

43.     GDS' statements in the 2017 20-F concerning the areas committed and areas utilized in GZ1 were false and misleading because, as discussed below, GDS had no presence at the G6 building, the occupants of the G6 building had no connections to GDS, and none of the

11

occupants of the G6 building were leasing their space from GDS.  Thus, GDS was not earning any revenue from the G6 building.

44.      Moreover, in a series of presentation slides that accompanied GDS' earnings call with analysts for the first quarter of 2018, Defendants falsely claimed that as of the end of the first quarter of 2018, the utilization rate of the GZ1 data center had increased to 93.7%. Defendants Huang and Newman hosted this earnings call.

**The Blue Orca Report Exposes GDS' Lies about the GZ1 Data Center**

45.      Blue Orca is an investment and research firm founded by Soren Aandahl.  After graduating from Harvard Law School, Mr. Aandahl clerked for U.S. District Judge Algenon Marbley of the Southern District of Ohio, and then practiced corporate law at the law firm of Kirkland & Ellis.  Mr. Aandahl subsequently joined Glaucus Research Group as Director of Research before founding Blue Orca.

46.      On July 31, 2018, shortly after the market opened, Blue Orca issued the BO Report revealing, among other things, that GDS' statements about the utilization of its GZ1 data center at the G6 building were false.

47.      Blue Orca found two independent operators of data centers - in other words, companies whose business competed directly with that of GDS - in the G6 building: GZIDC and Big One.

48.      According to the BO Report, Blue Orca contacted a sales representative for GZIDC to inquire about renting server storage space in the G6 building.  The GZIDC representative stated that GZIDC operated a data center on one-and-a-half floors in the G6 building, and sent Blue Orca a quote to rent out server space in GZIDC's data center at the G6

building.  GZIDC also sent Blue Orca a marketing brochure advertising its space in the G6 building.

49.    Blue Orca also checked GZIDC's website, which stated that GZIDC was located on the 5th floor of the G6 building, and GZIDC's website prominently features a picture of the G6 building.[7]

50.    Similarly, Blue Orca contacted Big One to inquire about renting data center space at the G6 building.  Big One's sales representative confirmed to Blue Orca that Big One operates a data center out of the G6 building, occupying one entire floor, and also sent Blue Orca a brochure offering server space in the G6 building.

51.    According to Blue Orca, the occupancy of the G6 building is as follows:

| Floor | Data Center Operator |
|:-----:|----------------------|
| 6 | Big One |
| 5 | GZIDC |
| 4 | GZIDC (1/2) |
| 3 | GDS? |
| 2 | GDS? |
| 1 | Lobby & Cooling Room |

52.    Hence, according to Blue Orca, even if they were to give GDS the benefit of the doubt and assume that GDS operates the 2nd, 3rd, and half of the 4th floor, GDS would *at most* have 50% of the G6 building committed, a far cry from the 100% that GDS claimed.  Indeed, if

---

[7] Located at: https://www.gzidc.com/idc.php (last accessed: December 24, 2018).

GDS' statements in the 2017 20-F and the Q1 Earnings Call were true, then GDS' data center must occupy all five data center floors in the G6 building.  Yet, GZIDC and Big One also operate out of the G6 building, and their data centers account for at least half of the data center space in the G6 building.

**Plaintiffs' Investigator Corroborates Blue Orca's Findings**

53.     Plaintiffs' investigator corroborated and supplemented Blue Orca's findings concerning the occupancy of the G6 building:

(a)     Confidential Witness 1 ("CW1"), a client services representative at South China Innovations Park, confirmed to Plaintiffs' investigator that South China Innovations Park owns the G6 building.  CW1 told Plaintiffs' investigator that South China Innovations Park does not permit tenants to sublease or assign a lease to third parties.

(b)     Confidential Witness 2 ("CW2"), a representative at Guangdong Zhonghe Lianyun Technology Co. Ltd. ("Guangdong Zhonghe"), informed Plaintiffs' investigator that Guangdong Zhonghe occupies approximately half of the 5th floor in the G6 building, and has been a tenant there since February 2018.  CW2 stated that the space was leased directly from South China Innovations Park.

(c)     CW2 also confirmed that the first floor is a lobby and does not have any data centers or tenants.

(d)     CW2 further stated that Chinese technology conglomerate Tencent occupies floors 2 and 3.  CW2 told Plaintiffs' investigator that Tencent also leased its space in the G6 building directly from South China Innovations Park.  Tencent is the world's largest gaming and social media company, and one of the most valuable technology companies in the world.

(e)     Online searches, including of GZIDC's website and third party websites,[8] confirm that GZIDC occupies the 5th floor of the G6 building.

(f)     Online searches, including Big One's website and third party websites,[9] confirm that Big One occupies the 6th floor in the G6 building.

54.     Thus, based on Plaintiffs' investigator's findings, the occupancy of the G6 building is as follows:

| Floor | Data Center Operator |
|---|---|
| 6 | Big One |
| 5 | Guangdong Zhonghe (1/2) / GZIDC (1/2) |
| 4 | Unknown |
| 3 | Tencent |
| 2 | Tencent |
| 1 | Lobby & Cooling Room |

55.     Plaintiffs' investigator's findings corroborate and complement those of Blue Orca. Putting Plaintiffs' investigator's findings together with Blue Orca's, the occupancy of the G6 building looks like this:

---

[8]  *See, e.g.,*  http://www.gzidc.net/FrontCms/getHelpArticleShow/cat_id/40/art_id/859.html (last accessed: December 24, 2018)
[9]  *See, e.g.,*  http://news.idcquan.com/scqb/88667.shtml (last accessed: December 24, 2018)

| Floor | Data Center Operator |
|-------|----------------------|
| 6 | Big One |
| 5 | Guangdong Zhonghe (1/2) / GZIDC (1/2) |
| 4 | GZIDC |
| 3 | Tencent |
| 2 | Tencent |
| 1 | Lobby & Cooling Room |

(GZIDC's sale representative told Blue Orca that it occupied 1.5 floors in the G6 building.  Blue Orca made the assumption that the GZIDC occupied all of floor 5, and half of floor 4.  Plaintiffs' investigator confirmed that it was actually the other way around: GZIDC occupies all of floor 4, but half of floor 5, with Guangdong Zhonghe occupying the other half.)

56.     Based on the combined findings of Blue Orca and Plaintiffs' investigator, GDS operates **no** data center at the G6 building.  Hence Defendants' claim that GDS operates 6,651 square meters in the G6 building, with 100% of it committed to data center customers, and 93.7% of which space is already generating revenue for GDS, is completely false.

57.     Whether GDS was actually operating, and deriving revenue, from the GZ1 data center is material to investors.  Per GDS' 2017 20-F, GDS only operated two data centers in Guangzhou: GZ1 with 6,521 square meters, and GZ2 with 6,131 square meters.  If GDS actually does not operate GZ1, then that eliminates half of GDS' data centers in Guangzhou, China's third largest city and an extremely important market for GDS.  Indeed, GDS stated in its 2017 20-F that "We generate significant revenue from data centers located in only a few locations and a ***significant disruption to*** <u>***any single location***</u> ***could*** <u>***materially and adversely***</u> affect our operations."  This is particularly true for GZ1, which is not only GDS' first data center in

Guangzhou, but also accounts for half of GDS' total data center floor area in Guangzhou and therefore half of its data center revenue.

**Fraud 2: GDS Inflates Purchase Price of Three Acquisitions**

**The Acquisitions**

*SZ5/Shenzhen Yaode*

58.     In the 2017 20-F, GDS stated that on June 29, 2017, it purchased a company that owned a data center in Shenzhen (the "SZ5" data center) for RMB 312 million:

> On June 29, 2017, we consummated an acquisition of all the equity interests in a target group from a third party for an aggregate contingent purchase price of RMB312.0 million (US$48.0 million). The target group owns a data center project ("SZ5") in Shenzhen, China.

59.     Elsewhere in the 2017 20-F, GDS disclosed that the acquired entity was Shenzhen Yaode,[10] which operates the SZ5 data center:

> Weiteng Construction, Weiteng Network, **Shenzhen Yaode**, EDC Shanghai Waigaoqiao and Zhangbei Yuntong operate the GZ1, GZ2, **SZ5**, SH1/SH2 and HB1 data centers, respectively.

> (Emphasis added).

*GZ2/Guangzhou Weiteng Network*

60.     In the 2017 20-F, GDS stated that on October 9, 2017, it acquired a company that owned a data center in Guangzhou (the "GZ2" data center) for RMB 234 million:

> On October 9, 2017, we consummated an acquisition of all equity interests in a target group from a third party for a cash consideration of RMB234.0 million (US$36.0 million). The target group owns a data center project ("GZ2") in Guangzhou, China.

61.     Elsewhere in the 2017 20-F, GDS disclosed that the acquired entity was

---

[10] Per the 2017 20-F, Shenzhen Yaode's full corporate name is Shenzhen Yaode Data Services Co. Ltd.

Guangzhou Weiteng Network,[11] which operates the GZ2 data center:

> Weiteng Construction, **Weiteng Network**, Shenzhen Yaode, EDC Shanghai
> Waigaoqiao and Zhangbei Yuntong operate the GZ1, **GZ2**, SZ5, SH1/SH2 and
> HB1 data centers, respectively.

(Emphasis added).

*GZ3/Guangzhou Weiteng Data*

62.     On May 29, 2018, GDS filed a Form 6-K with the SEC announcing results for the

first quarter of 2018 (1Q18 6-K).  Defendant Huang signed the 1Q18 6-K.  In the 1Q18 6-K,

GDS disclosed that it had acquired another data center in Guangzhou (the "GZ3" data center),

for RMB 262 million:

> In May 2018, the Company consummated an acquisition of all equity interests in
> a target group from a third party for an aggregate purchase price of
> RMB262,244[12] (including contingent considerations of RMB245,244). The target
> group owns a data center in Guangzhou, China (Guangzhou 3).

63.     While GDS did not disclose in the 1Q18 6-K the name of the acquired company,

Blue Orca's investigator found – and GDS later confirmed - that it was Guangzhou Weiteng

Data[13] (discussed in further detail below).

**Blue Orca Discovers that GDS Overstated the Purchase Price for all Three Acquisitions**

64.     Based on its review of relevant regulatory filings with China's SAIC, Blue Orca

discovered that GDS massively overstated the purchase price of all three acquisitions.

65.     The SAIC is China's powerful regulatory agency in charge of market supervision

and regulation.  All PRC companies are required to, among other things, register with the SAIC,

---

[11] Per the 2017 20-F, Guangzhou Weiteng Network's full corporate name is Guangzhou
Weiteng Network Technology Co. Ltd.
[12] In thousands.  This equates to approximately $41.1 million USD.
[13] The company's full name is Guangzhou Weiteng Data Technology Co. Ltd.

file annual financial reports, as well as report all changes in shareholding.  In other words, the SAIC's responsibilities roughly mimic those of the SEC and the secretaries/departments of corporations of individual states in the U.S.  The SAIC also has a law enforcement role in regulating businesses and penalizing them for non-compliance.

66.     When an equity interest in a company is transferred, the changes must be registered with the SAIC.  Therefore, if a PRC company is sold, the company's SAIC filings must contain details of the sales, including the identities of new equity interest holders, and the transfer or sale price.

67.     Concerning the SZ5/Shenzhen Yaode transaction, the BO Report revealed that Shenzhen Yaode's SAIC filings show that on June 21, 2017, the shareholders of Shenzhen Yaode agreed to sell 100% of their equity interest in Shenzhen Yaode to a GDS subsidiary, Beijing Wanguo Chang'an Science & Technology ("GDS Beijing") for only RMB 500,000, not RMB 312 million as GDS stated in the 2017 20-F.  The BO Report included an image of the Shenzhen Yaode shareholders' resolution documenting this transfer and the sales price.

68.     Concerning the GZ2/Guangzhou Weiteng Network acquisition, the BO Report revealed that Guangzhou Weiteng Network's SAIC filings show that on November 3, 2017, Guangzhou Weiteng Network's shareholders agreed to sell 100% of their equity interest to GDS's VIE, Global Data Solutions Co. Ltd., for RMB 72 million, not RMB 234 million as GDS stated in the 2017 20-F.  The BO Report included an image of the Guangzhou Weiteng Network shareholder resolution documenting this transfer and the sales price.

69.     Concerning the GZ3/Guangzhou Weiteng Data transaction: while the 1Q18 6-K did not disclose the identity of the company that GDS acquired, the BO Report stated that the acquired company was Guangzhou Weiteng Data based on the following reasons:

(a)     Guangzhou Weiteng Data's SAIC filings include a shareholders resolution in which the shareholders of Guangzhou Weiteng Data agreed to sell 100% of their equity interest to GDS's VIE, Global Data Solutions Co. Ltd. (the same GDS entity that acquired Guangzhou Weiteng Network).  The shareholders' resolution was dated May 2, 2018, which matches GDS' announcement that this acquisition occurred in May 2018.

(b)     In its April 18, 2018 press release announcing the acquisition of GZ3, GDS stated that GZ3 was located in the Guangzhou Innovations Park.  And that's where Guangzhou Weiteng Data was located.

70.     GDS itself confirmed on its 2018 Q2 earnings call that the acquired company was Guangzhou Weiteng Data.

71.     The May 2, 2018 Guangzhou Weiteng Data shareholder resolution, however, showed that the transfer price was actually only RMB 40 million, not RMB 262 million as GDS reported in its 1Q18 6-K.

72.     The table below summarizes the discrepancy between the purchase prices of the three acquisitions as reported by GDS and what Blue Orca found:

| Transaction | GDS' disclosed price | Blue Orca's true price | Difference |
|---|---|---|---|
| SZ5 | RMB 312 million | RMB 0.5 million | RMB 311.5 million |
| GZ2 | RMB 234 million | RMB 72 million | RMB 162 million |
| GZ3 | RMB 262 million | RMB 40 million | RMB 222 million |

**GDS Insiders Inflated Purchase Price so that they could Siphon off the Difference**

73.     According to Blue Orca, Defendants inflated the purchase prices of the three acquisitions so that GDS insiders could siphon off the difference.  The BO Report pointed to several indicia in support of the theory that GDS insiders were looting the Company to line their own pockets.

74.     GDS has been a serial capital raiser since 2015.  Combining capital raised from debt and equity, GDS raised RMB 1.1 billion (or approximately $159 million USD) in 2015, RMB 2.1 billion ($304 million) in 2016, RMB 2.3 billion ($333 million) in 2017, and RMB 2.1 billion ($304 million) in the first quarter of 2018, for a combined total of RMB 7.6 billion (or approximately $1.1 billion USD).

75.     This mammoth fundraising would make sense if the money were used to build or buy data centers in China, which is GDS' primary line of business.  However, most of GDS' cash balance has been sitting offshore and is not denominated in RMB.  Based on GDS's SEC filings, Blue Orca found that in 2016 and 2017, 60.9% and 65.5%, respectively, of GDS' cash balance was kept offshore.  Similarly, in 2016 and 2017, 72.8% and 76.4%, respectively, of GDS' cash balance was not in RMB.  This is befuddling for a company that operates exclusively in China.  In its response to the BO Report, discussed in further detail below, GDS did not dispute these figures and did not deny that most of its cash is kept offshore and not denominated in RMB.

76.     Because most of GDS' money is not in China and not in RMB, GDS disclosed in the 2017 20-F that it was borrowing money in China at interest rates of up to 9.7% , while most

of its cash sits offshore, and earning far less than 9.7% interest.[14]

      77.    Thus Blue Orca concludes:

**Why does a business that operates exclusively in China keep over 65% of its cash off-shore?** […] We think it is reasonable to infer that they [inflated the purchase price of the three acquisitions] because insiders looted the difference between the stated and the actual purchase price.

If your goal was to loot money from a U.S.-listed Chinese company, you would want to keep as much cash off-shore, and in currencies other than RMB, because of China's strict capital controls. In this case, the shoe fits. GDS keeps the bulk of such cash offshore, where it is easily looted by insiders but useless for building a data center in China or operating its business.

## POST-CLASS PERIOD DEVELOPMENTS

**Defendants Concoct Theory to Explain Away the Fraud**

      78.    The next day, on August 1, 2018, GDS issued a press release responding to the BO Report.

      79.    Regarding the GZ1 data center, GDS falsely claimed that the entire space in GZ1 had been committed to two unnamed customers, and that GZIDC and Big One were merely tenants of one of the two customers.

      80.    Regarding the overstatement of purchase price of the three data centers, GDS falsely stated that the purchase price shown in the SAIC filings "only reflect a portion" of the total purchase price.

      81.    GDS confirmed Blue Orca's finding that most of GDS' cash was sitting offshore. However, GDS claimed that approval from the Chinese government was needed to remit

---

[14] According to Blue Orca's calculations based on GDS' SEC filings, GDS' unused cash balance earned an average of 0.6% interest from FY2015 to the first quarter of 2018.

offshore money into China, and therefore, GDS "holds its cash offshore" until there is a specific need for the money in China.

82.     Two weeks later, during its 2018 Q2 earnings call on August 14, 2018, Defendants attempted to add more color to the spin.  Both Defendant Huang and Defendant Newman were on this call.  According to Defendant Newman, China restricts foreign companies from holding licenses to operate data centers.  Because GDS is a foreign holding company rather than a domestic PRC company, GDS is allowed to own physical real estate in China (i.e. the data center), but is not permitted to obtain the IDC (i.e. internet data center) license needed to operate the data center.  Therefore, each acquisition had to be executed in two steps: acquisition of the "asset-co" (the company holding the physical asset, i.e. the data center) and acquisition of the "license-co" (the company holding the IDC license needed to provide value-added services at the data center).  Only a PRC company can buy the license-co.

83.     Hence in the case of GDS, each of the three acquisitions was done in two steps. First, one of GDS' wholly-owned subsidiaries in Hong Kong purchased the (Hong Kong) entity which held the asset-co, and then one of GDS' VIEs in China purchased the license-co. According to Defendants, the SAIC filings only reflect the license-co part of the transaction (which occurred in the PRC), but not the asset-co portion (which occurred in Hong Kong). GDS prepared PowerPoint slides as part of the 2018 Q2 earnings call to illustrate this convoluted two-step transaction structure for each of the three transactions.   The relevant PowerPoint slides are attached hereto as Exhibit 2.

**GDS' Spin Doesn't Make Sense**

84.     GDS' attempt to explain away its fraud, however, doesn't make sense, and contradicts the findings of Blue Orca and Plaintiffs' investigator.

85.     First, GDS' explanation that the GZ1 data center is 100% committed to two customers (whom GDS refuses to name), and that GZIDC and Big One were merely leasing their space from GDS' customer, is unconvincing for several reasons:

(a)     CW1, the client services representative who works for South China Innovations Park, the landlord of GZ1, told Plaintiffs' investigator that re-leasing or subleasing rented space to third parties is not permitted.

(b)     Guangzhou Weiteng Construction's purported lease for the GZ1 data center, which GDS attached as an exhibit to its Registration Statement, states that the tenant may not sublease the property without obtaining the landlord's written consent (and CW1 said the landlord doesn't permit it).

(c)     CW2 told Plaintiffs' investigator that his company, Guangzhou Zhonghe, which occupies half of the 5th floor of GZ1, rented the space directly from the landlord.

(d)     CW2 also told Plaintiffs' investigator that Tencent, which occupies two floors in GZ1, also rented the space directly from the landlord.

(e)     It doesn't appear that Tencent rented the floors from GDS.  Tencent is one of the most well-known and prestigious companies in China.  If Tencent were a customer of GDS and rents data center space from GDS, GDS would likely have publicized this fact to boost its profile and marketing efforts.  Indeed, in its 2017 20-F and its Registration Statement, GDS made sure to boast that one of its customers was Aliyun, a subsidiary of the Chinese technology company Alibaba.  If Tencent was itself a customer of GDS, it's hard to imagine that GDS wouldn't also publicize this fact to raise its profile and prestige.

86.     Second, GDS' fanciful theory about the SZ5, GZ2 and GZ3 acquisitions being "two-step" transactions is also unconvincing:

(a)     For the SZ5 (Shenzhen Yaode) acquisition, GDS admitted that its Chinese VIE, GDS Beijing, purchased Shenzhen Yaode for only RMB 0.5 million.  But because Shenzhen Yaode was the license-co, GDS executed a separate purchase whereby its Hong Kong subsidiary EDE III Limited purchased a Hong Kong company that held Guangzhou Shi Wan Guo Yun Lan Data Technology ("WGYL"), which is the asset-co.  GDS claims that the asset-co portion of the transaction was RMB 311 million, and so the RMB 312 million purchase price that GDS claimed in the SEC filings was correct.

(b)     But Shenzhen Yaode, the supposed license-co, did not even have an IDC license.  The PRC Ministry of Industry and Information Technology ("MIIT") provides an online database for the public to check whether a data center operator has an IDC license.[15] Blue Orca checked, and Plaintiffs confirmed, that the MIIT database does not show Shenzhen Yaode as possessing an IDC license.[16]

(c)     Indeed, GDS admits in the 2017 20-F that Shenzhen Yaode did not have an IDC license, and that Shenzhen Yaode was actually operating the data center under GDS Beijing's IDC license:

> In June 2017, we consummated an acquisition of all the equity interests in a target group from a third party for an aggregate contingent purchase price of RMB312.0 million (US$48.0 million), subject to adjustment, if any, pursuant to the terms and conditions of the equity purchase agreement. The target group owns SZ5 in Shenzhen, China. As of the date of the acquisition, the data center had just commenced its operations. **The company operating the data center**

---

[15] Available at http://www.miit.cc/telecom-search/
[16] Blue Orca published a rebuttal to GDS' response on August 9, 2018.

**has been authorized by GDS Beijing to provide IDC services under GDS Beijing's IDC license.**

(emphasis added).

Thus there's no reason here for a two-step transaction where the second step to acquire the license-co is completely unnecessary because GDS Beijing already has the IDC license and is able to authorize another entity to operate under its license.

(d)     Moreover, Plaintiffs' investigator independently obtained the SAIC filings of WGYL, the asset-co that GDS claims it paid RMB 311.5 million to acquire (by comparison, the license-co Shenzhen Yaode only cost GDS RMB 0.5 million).  WGYL's SAIC files contain a copy of the lease for WGYL's headquarters.  The lease was signed by Zeng Jialin, who served as WGYL's legal representative from August 2016 to June 2017, and the landlord was South China Innovations Park.  The lease covered the period from May 1, 2015 to July 2028.  According to the lease, the total amount of space leased to WGYL was a tiny 25 square meter (i.e. 82 square feet) room – the size of a walk-in closet, and the monthly rent for June 2017 set forth in the lease, when GDS acquired WGYL, was only RMB 413 (or approximately $60 USD based on June 2017 exchange rates).  Additionally, WGYL's 2017 SAIC financials show a net loss of RMB 61.68 million.  The SAIC filings also show that WGYL only had 2 employees as of December 31, 2016.  It's inconceivable that GDS paid RMB 311.5 million – which made up 99% of the total transaction price for the SZ5 acquisition – for an asset-co whose headquarter is a tiny 25 square meter room with a monthly rent of approximately $60, who only employed 2 people, and who had a net loss of more than RMB 61 million in 2017.

(e)     GDS' two-step transaction explanation also does not make sense for the GZ2 (Guangzhou Weiteng Network) acquisition.  At the time of GDS' acquisition of

Guangzhou Weiteng Network, the latter was majority-owned by a company called Shenzhen Ningguanghong Technology ("SNT"), whose shares traded OTC in China on the Chinese National Equities Exchange and Quotations board ("NEEQ").  When GDS acquired Guangzhou Weiteng Network, SNT released an "Asset Sales and Material Asset Restructuring Report" ("Asset Sales Report").  The Asset Sales Report, which Blue Orca and Plaintiffs both obtained and is available online,[17] states that Guangzhou Weiteng Network was the lessee of the building which houses the GZ2 data center ***and*** had property, plant and equipment valued at RMB 167.6 million.  The MIIT website confirmed that Guangzhou Weiteng Network has a valid IDC license.  Therefore, Guangzhou Weiteng Network owned ***both*** the IDC license ***and*** the physical assets.  This undermines GDS' claim that these transactions had to be "two-step" transactions involving an asset-co and a license-co.  Guangzhou Weiteng Network was both.  GDS didn't need to buy a separate asset-co as part of this transaction.[18]

87.    It strains credulity that GDS paid RMB 72 million for Guangzhou Weiteng Network, which had both the IDC license and physical assets, and yet supposedly paid an additional RMB 162 million – more than twice what GDS paid to acquire Guangzhou Weiteng Network – as part of the same transaction to acquire a separate asset-co that: (1) wasn't necessary because Guangzhou Weiteng already has the physical assets and operates a data center, and (2) doesn't possess an IDC license.

88.    GDS' explanation for why most of its cash is kept offshore also makes no sense.  GDS said because government approval is needed to remit money, GDS only moves its cash into

---

[17]  Available at:  http://www.neeq.com.cn/disclosure/2017/2017-09-08/1504870645_945691.pdf (last accessed: December 24, 2018).

[18] Faced with this fact, even GDS had to admit that Guangzhou Weiteng Network was both an asset-co and license-co.  *See* Exhibit 2, GDS' PowerPoint slides.

China when there is need.  But GDS borrows money by taking out massive loans in China with interest rates up to 9.7%.  Hence it clearly has the need for cash in China.

(a)      According to the 2017 20-F, GDS had RMB 239.7 million (approximately $34.7 million) in short-term borrowings as of December 31, 2016, which increased to RMB 462.9 million (approximately $67 million) as of December 31, 2017.  The weighted average interest rates for these short-term loans were 5.27% in 2016 and 7.93% in 2017.

(b)      According to the 2017 20-F, GDS had RMB 1.89 billion (approximately $274 million) in long-term borrowings as of December 31, 2016; this amount ballooned to RMB 3.78 billion (approximately $547 million) as of December 31, 2017.  The weighted average interest rates for these long-term loans were 8.16% in 2016 and 6.93% in 2017.

(c)      In November 2017, one of GDS' subsidiaries took out a RMB 200 million (approximately $28.9 million) loan at 9.7% interest.

89.    Defendants' explanations are false exculpatory statements, and the fact that Huang and Newman offered these false explanations means that they were aware of the fraud and intended to deceive the investing public.

**ADDITIONAL ALLEGATIONS SUPPORTING FRAUD**

90.    According to the 2017 20-F, GDS had RMB 117,192,000 in unbilled accounts receivables in 2016, and this figure more than doubled to RMB 253,724,000 in 2017.  Unbilled accounts receivables are amounts that GDS has already recognized as revenue, but for which GDS has not issued any invoices.

91.    The RMB 117,192,000 of unbilled accounts receivables in 2016 accounted for 59% of GDS' RMB 198,851,000 total accounts receivables in 2016.

92.     In 2017, the RMB 253,724,000 of unbilled accounts receivables accounted for 70% of GDS' RMB 364,654,000 total accounts receivables that year.

93.     According to Blue Orca, it is bizarre that GDS' billing practices somehow deteriorated to the point where it's not billing customers for 70% of its uncollected revenues. Blue Orca believes that the mounting accounts receivables corroborate evidence of fabricated revenues.  Because if revenue cannot be tied to a specific invoice, the lack of a paper trail makes it difficult for auditors to check the authenticity of the receivables and the underlying revenue.

94.     This provides circumstantial support that GDS was inflating revenue (e.g. by overstating the areas committed and utilized of its data centers such as GZ1) because it is easy for GDS to fabricate revenue if it did not have to produce an invoice for auditors to verify.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired GDS ADSs during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of GDS, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

96.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GDS ADSs were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

97.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

98.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of GDS;

(c)     whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Defendants caused GDS to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements;

(f)     whether the prices of GDS ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

101.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose materials facts during the Class Period; (b) the false and misleading statements and/or omissions were material; (c) GDS' ADSs traded in efficient markets during the Class Period.

102.    GDS' ADSs traded in efficient markets during the Class Period for the following reasons:

(a)     GDS' ADSs met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     On average more than 2% of GDS' total ADSs outstanding were traded weekly during the Class Period;

31

(c)     As a public issuer, GDS filed periodic public reports with the SEC and NASDAQ;

(d)     GDS regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     GDS was followed by numerous securities analysts employed by major brokerage firms, including JP Morgan, Guggenheim, Credit Suisse, etc., who wrote reports that were widely distributed and publicly available;

(f)     More than ten market makers made a market in GDS' ADSs during the Class Period;

(g)     GDS met the criteria for eligibility to file a S-3 Registration Statement during the Class Period;

(h)     The price of GDS' ADSs responded quickly to incorporate and reflect new public information concerning GDS during the Class Period.

103.    Based on the foregoing, the market for GDS' ADSs promptly digested current information regarding GDS from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

104.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in

their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

105.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

106.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of GDS ADSs during the Class Period.

109.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GDS were materially false and misleading;

knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt and knowledge of information reflecting the true facts of GDS, their control over, and/or receipt and/or modification of GDS allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GDS, participated in the fraudulent scheme alleged herein.

110.    Individual Defendants, who are the senior-most officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GDS personnel to members of the investing public, including Plaintiffs and the Class.

111.    As a result of the foregoing, the market price of GDS ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of GDS ADSs during the Class Period in purchasing GDS ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

112.    Had Plaintiffs and the other members of the Class been aware that the market price of GDS ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased GDS ADSs at the artificially inflated prices that they did, or at all.

113.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

114.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of GDS ADSs during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

115.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.    During the Class Period, the Individual Defendants participated in the operation and management of GDS, and conducted and participated, directly and indirectly, in the conduct of GDS' business affairs. Because of their senior positions, they knew the adverse non-public information about GDS' misstatements.

117.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GDS financial condition and results of operations, and to correct promptly any public statements issued by GDS which had become materially false or misleading.

118.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GDS disseminated in the marketplace during the Class Period concerning GDS' financials results and business operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GDS to engage in the

wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GDS within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GDS ADSs.

119.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GDS.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: December 24, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/*Phillip Kim*
Phillip Kim (admitted *Pro Hac Vice*)
Yu Shi (admitted *Pro Hac Vice*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060

Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

**STECKLER GRESHAM COCHRAN PLLC**
R. Dean Gresham (Texas Bar No. 24027215)
L. Kirstine Rogers (Texas Bar No. 24033009)
12720 Hillcrest Rd., Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com
Email: krogers@stecklerlaw.com

*Liaison Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of December 2018, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Phillip Kim*